UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

00 SEP 22 PM 3:59

U.S. DISTRICT COURT
N.D. OF ALABAMA

YUTIEVE BOTT-JENKINS,        )
                             )
    Plaintiff,               )
                             )
vs.                          )   Civil Action No. CV-99-S-0926-NE
                             )
MADISON COUNTY BOARD OF      )
EDUCATION,                   )
                             )   ENTERED
    Defendant.               )
                                 SEP 22 2000

## MEMORANDUM OPINION

Plaintiff alleges that she was subjected to unlawful discrimination in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* She claims that defendant subjected her to a sexually hostile work environment, failed to promote her to a supervisory position because of her gender, and discharged her in retaliation for asserting federally protected rights. In addition, plaintiff contends that defendant published defamatory statements about her employment record and abilities. The action presently is before the court on plaintiff's motion for partial summary judgment, and, defendant's motion for summary judgment.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally Celotex Corp., supra; Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court there is an absence of evidence to support the non-movant's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the

2

non-moving party cannot rest upon the pleadings; rather, Fed. R. Civ. P 56(e) requires the party opposing summary judgment to go beyond the pleadings, and to demonstrate by affidavit or other appropriate means that there is a genuine issue of material fact for trial.[1]  *See also, e.g.*, *Jeffery*, 64 F.3d at 593.  Moreover, the nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor.  *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Inferences in favor of the non-movant are not unqualified, however.  "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment."  *Resolution Trust*

---

[1] Federal Rule of Civil Procedure 56(e) provides, in pertinent part, that:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted).  Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment.  *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).  A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

When presented cross motions for summary judgment, "[t]he

4

court must rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2720; *see also, e.g., Arnold v. United States Postal Service*, 649 F. Supp. 676, 678 (D. D.C. 1986) (Richey, J.). The court is required to "relate all material facts in genuine dispute in the light most favorable to the party resisting summary judgment." *Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 24 (1st Cir. 1997) (citing *Sanchez v. Alvarado*, 101 F.3d 223, 225 n.1 (1st Cir. 1996)).

When the party moving for summary judgment bears the burden of persuasion on an issue, if the case proceeded to trial, it must satisfy not only the initial Rule 56(c) burden of showing there are no genuine issues of material fact, but it also must carry its ultimate burden by showing that it would be entitled to a directed verdict at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2458, 2553-54, 97 L.Ed.2d 265 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116-17 (11th Cir. 1993).

## II. SUMMARY OF FACTS

Plaintiff, Yutieve Bott-Jenkins, who also is known as Eve

Jenkins,[2] was employed by defendant, the Madison County Board of Education ("the Board"), for approximately one year, from an undisclosed date during October of 1996 until October 17, 1997.[3] She principally worked as a member of a "floor crew."[4] The duties of such personnel included sweeping the floors of all schools within the county system, stripping old wax from floor surfaces, scrubbing the exposed surfaces, re-waxing, and buffing for luster.

Male employees dominated the custodial workforce in more than just numbers:  they regularly used vulgar language and told offensive gender-based jokes.  Plaintiff complained to her supervisor, but was told she worked in a "man's business" and that such behavior was part of the job.[5]

In the fall of 1996, an oversized brassiere was placed on the doorknob of an office near an open area of the operations building where custodial employees met each morning, before being dispersed among the various county schools.[6]  The male crew members found the

---

[2] *See, e.g.*, plaintiff's brief in opposition to defendant's motion for summary judgment (doc. no. 39), at 1 ("Yutieve Bott-Jenkins (hereinafter 'Eve Jenkins') is the plaintiff in the above-styled cause of action.") (emphasis supplied).

[3] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 1.  Plaintiff was initially employed by defendant on an intermittent basis, in a substitute capacity.  She became employed on a regular, full-time basis on December 9, 1996.

[4] *Id.*

[5] *Id.*; Complaint ¶ 10.

[6] Plaintiff's deposition at 181.

6

incident humourous.[7]

On another occasion, feminine hygiene products (tampons) were strewn around the crew's break room.[8]  Several male crew members laughed lewdly as plaintiff cleaned up the items.[9]

Plaintiff complained about both incidents to one of her supervisors, Roosevelt Carter.[10]  No one was reprimanded, however.[11]

In June of 1997, the Board advertised an opening for the position of custodial services supervisor.[12]  The <u>required</u> qualifications for the position included being at least 18 years of age, having a high school diploma or equivalent, and a valid drivers license.[13]  The position announcement added, however, that the Board <u>preferred</u> candidates who held a two or four year college degree, and possessed prior experience as a supervisor.[14]

Plaintiff applied.  She believed that she was the "most qualified" applicant, because she held a four-year degree in criminology, had previous supervisory experience in both volunteer

---

[7] *Id.* at 182.

[8] *Id.* at 184.

[9] *Id.* at 184-185.

[10] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 1.

[11] *Id.* at 1-2.

[12] Plaintiff's evidentiary submission, volume II (doc. no. 30), at 20.

[13] *Id.*

[14] *Id.*

and work-related settings, and extensive custodial experience.[15] In addition, during the relatively brief period plaintiff worked for the Board, she occasionally acted in a supervisory capacity when regular supervisors were absent.[16]   Moreover, the Board's manager of operations, Kerry Wilkerson, told plaintiff the position likely would be awarded to her because, of the fifteen applications received,[17] five applicants were from outside the county school system, and three had no prior supervisory experience.[18]  Plaintiff, however, was not even interviewed.

She was not alone in that respect.  Indeed, only five of the fifteen applicants were accorded an interview by a screening committee created at the direction of the Superintendent of the county school system, Billy Broadway, and chaired by the Assistant Superintendent, Lynn Holladay.  Broadway instructed Holladay to recruit the assistance of departing custodial supervisor Roosevelt Carter (whose position was to be filled), the Board's manager of operations (Kerry Wilkerson), and one school principal to be

---

[15] Complaint ¶ 11; Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 2.

[16] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 2.

[17] Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 5 (Wilkerson deposition), at 41.

[18] Complaint ¶ 11; According to one witness, David Bailey, Wilkerson made this statement to plaintiff in the presence of at least four other persons, including plaintiff's supervisor, Roosevelt Carter.  Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 9 (Affidavit of David Bailey).

selected by Holladay.    (Holladay ultimately chose Dan Evans,

Principal of New Market High.[19])  The committee was charged with the

mission of thinning the fifteen applicants to five, and then

interviewing those persons.[20]   Holladay described the winnowing

process as focusing upon four factors:

> A.   We put 15 names on the board, we went though the
>      process, we looked at the ability to supervise,
>      what we perceived as the ability to supervise, the
>      ability to get along with others, length of County
>      experience and education.  We looked at those four
>      things and tried to fit it in with what we thought
>      was the best requirements for that job.
>
> Q.   How were comments solicited from your committee,
>      did you go name by name and talk about each one?
>
> A.   Yes.[21]

After the committee members discussed the correspondence of each

applicant to such criteria, names were struck until only five

persons remained.[22]   According to Holladay, plaintiff was struck

from the list based on negative comments relayed by two committee

---

[19] Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 4 (Holladay deposition), at 34; Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 25 (Affidavit of Superintendent Billy Broadway), at ¶ 3.

[20] Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 4 (Holladay deposition), at 49; Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 25 (Affidavit of Superintendent Billy Broadway), at ¶ 3.   It should be noted that Dan Evans' duties on the committee were limited to assisting in the interview process and, hence, he was not present at the meeting where the fifteen applicants were narrowed down to five.

[21] Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 4 (Holladay deposition), at 50.

[22] *Id.* at 50-51.

members.   Roosevelt Carter questioned her ability to supervise,[23]
and Lynn Holladay had been previously informed by Dan Evans of an
incident involving plaintiff that had occurred in Evans' office.[24]
Holladay testified:

> Q.   How did it come up about the incident with Dan
>      Evans?
>
> A.   When I called and asked Mr. Evans to serve on the
>      committee, he asked the names or who had applied
>      for the job.  And I went down the list.  And we got
>      to her name, and he made a comment about some
>      things she had said or an outburst in his office.
>      . . .
>
> Q.   Did you check [plaintiff's] personnel file to see
>      if there was any negative history in her file?
>
> A.   I did not.[25]

The five persons selected for interview were asked twelve
identical questions, pertaining to issues or situations that a
custodial supervisor might encounter on the job.[26]  Each committee
member then rated each candidate's responses on a scale of one to
five.  The committee members also ranked each person on the basis
of personal appearance, poise, and speech.  When the individual
ratings were tallied, John Speck achieved the highest score, and

---

[23] *Id.* at 42-43.

[24] See note 20 *supra*: Dan Evans was not present during the initial meeting
of the screening committee and communicated his comments concerning plaintiff to
Assistant Superintendent Holladay in advance.

[25] *Id.* at 47-48.

[26] Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 13.

the committee recommended to Superintendent Broadway that he be hired.  Broadway, consistent with his responsibilities in this regard, subsequently submitted Speck's name to the Board, which approved the Superintendent's recommendation.[27]

Plaintiff learned on July 25, 1997, that the Board had hired John Speck to fill the custodial supervisor position, replacing Roosevelt Carter, and that Johnny Parker had been awarded a temporary supervisory position, replacing Will Hill, who was not able to work due to extended illness.  Plaintiff believed that she was better qualified than either man, because neither Speck nor Parker held a college degree and both lacked custodial experience.[28] Moreover, when Speck assumed his supervisory position, plaintiff had to teach him basic floor cleaning techniques and how to safely use the necessary machines.[29]

Upset by these events, and believing she had been unfairly excluded from the interview process, plaintiff insisted on speaking privately with Roosevelt Carter.  Carter told plaintiff to calm down, and not act like an "emotional woman."[30]  Plaintiff retorted

---

[27] Id.; Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 25 (Affidavit of Superintendent Billy Broadway), at ¶ 4.

[28] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 2.

[29] Id. at 3; Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 10 (Affidavit of Chris Farmer).

[30] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit

11

that she was disappointed with Carter, and that he was acting like a "butt kisser."[31]

Plaintiff then left the operations building, where she was met by her daughter, Kelly Bott, and her daughter's fiancé, David Bailey.   After relating the substance of her conversation with Carter, Bailey referred to Carter as a "nigger."[32]   Plaintiff reprimanded Bailey,[33] but the racial slur obviously was overheard, because Kerry Wilkerson later telephoned plaintiff and asked whether she had used the offensive racial slur when referring to Carter.   Plaintiff denied that she had done so, and explained that she had reprimanded her daughter's fiancé for using the term.[34]

Plaintiff later telephoned Assistant Superintendent Holladay, and asked why she had not been interviewed.   Holladay replied that he had not even read her resume.   He also said the position

---

1 (Affidavit of plaintiff), at 2.

[31] *Id.*   Carter disagreed with plaintiff's account of this meeting.   He testified that, upon entering his office, plaintiff said, "Roosevelt, I thought you were my friend, but you are just an ass kisser like all the rest of them," at which point he told her their conversation was over.   Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 3 (Carter deposition), at 38 (emphasis supplied).

[32] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 2; Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 9 (Affidavit of David Bailey).

[33] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 2.

[34] *Id.*   Wilkerson later testified that there were conflicting reports as to who had uttered the racial slur.   Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 5 (Wilkerson deposition), at 35.

required a person with a "strong hand," because it involved supervising men, and added that questions had been raised regarding plaintiff's honesty and the falsifying of her time sheets.[35] Following that conversation, plaintiff informed her new supervisor, John Speck, that she was going to the Equal Employment Opportunity Commission.[36]

Plaintiff contends that she experienced increased hostility on the job after Speck became custodial services supervisor. Despite the fact that she had trained Speck in several aspects of his new position, he became visibly angry when others sought her advice about equipment operation or cleaning techniques. Speck informed other employees that they were not permitted to seek instruction from plaintiff regarding the performance of custodial tasks.[37] Plaintiff was regularly reprimanded by Speck in a threatening and demeaning tone in the presence of other employees, but male

---

[35] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 2. Plaintiff denies that she falsified time sheets, and adds that she had never been disciplined or reprimanded for such.

[36] *Id.* at 3. Plaintiff informed Speck of her contacting the EEOC by making a notation on a "floor crew log." This log sheet was turned into plaintiff's custodial supervisor and Speck later testified that he had, indeed, read plaintiff's notation. Plaintiff's affidavit states that she turned in this log sheet in August of 1997. However, a log sheet matching that description and dated July 21, 1997, was produced during plaintiff's deposition. Plaintiff testified that that log sheet which contained the notation, "I went to Birmingham to EEOC office because of yesterday," was not hers, and the writing on it was not in her handwriting. Plaintiff's deposition at 189-190.

[37] *Id.*

employees were not subjected to similar treatment.  He repeatedly asked plaintiff to resign.[38]

Plaintiff contends that Speck also took affirmative steps to discredit her.  She claims that he went to Liberty Middle School one weekend, when no floor crew was scheduled to work there, and burned the floor with a burnisher.  When plaintiff and her crew arrived at Liberty the following Monday, they noticed the scorched floor and informed the principal.  Speck then reprimanded plaintiff and her crew, and attempted to place the blame for the damage on them.[39]

In August of 1997, plaintiff suffered an on the job "injury": she had a physical reaction to mold spores when cleaning a school bathroom.[40]   Speck refused to process her occupational injury report.[41]   Plaintiff claims that his refusal was an attempt to characterize her missed days of work as vacation or sick leave, thereby positioning her for termination if she missed future days of work.[42]

---

[38] Id.

[39] Id.  Speck claims that he never blamed plaintiff for the burned floors, and that another custodial employee, Bobby Martin, had been the individual using the burnisher on the occasion in question.  Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 1 (Speck deposition), at 72-74.

[40] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 3.

[41] Id.

[42] Complaint ¶ 12.

Finally, one morning in September of 1997, Speck again asked for plaintiff's resignation.   She responded that she would be a "jack ass" to give him her resignation.[43]  Because of this exchange, Speck recommended her termination.[44]  He wrote an internal memo to Dr. Jimmy Nash, the director of personnel, requesting that the Board consider terminating plaintiff's employment.[45]   Speck's request was based on both his verbal exchange with plaintiff, and the allegation that she was "difficult to supervise."[46]  Dr. Nash forwarded Speck's request to Superintendent Broadway, who in turn, presented the termination recommendation to the Board.[47]  The Board approved the recommendation, and plaintiff was terminated on October 17, 1997.[48]

---

[43] Plaintiff's deposition at 165.

[44] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 3.  Speck disputes that he ever sought plaintiff's resignation and remembers the above exchange differently.  He testified that he had met with plaintiff to review her time sheet because she had made a request for work-related injury leave on her time sheet, but that such an injury had never been verified.   During the exchange, Speck claims plaintiff became uncooperative and demanded a copy of her time sheet.  As plaintiff was leaving from meeting, Speck alleges that she commented that "she was tired of her jack ass supervisor."  Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 1 (Speck deposition), at 61.

[45] *Id.* at 76; Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 22.

[46] Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 1 (Speck deposition), at 76.

[47] Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 25 (Affidavit of Superintendent Billy Broadway), at ¶ 7-9.  According to Broadway, the termination recommendation was based on several reports of plaintiff's use of inappropriate and insubordinate language.  Id. at ¶ 8.

[48] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 1.

Plaintiff contends she was fired in retaliation for her complaints to management and the EEOC regarding an allegedly sexually hostile work environment and the Board's failure to award her the custodial supervisor's position.[49]

Plaintiff's complaint in this action also includes a state law claim of defamation. She asserts that John Speck, Kerry Wilkerson, and Lynn Holladay published to third parties false statements regarding her employment history and work ability. The defamatory statements referred to the fact that she had an unsatisfactory employment record, that she had falsified time sheets, and that she had engaged in insubordinate acts.[50]

For purposes of considering plaintiff's motion for partial summary judgment, it is necessary to note events occurring after the date of plaintiff's termination.

On November 11, 1997, plaintiff received a "Notice of Determination" from the State of Alabama Department of Industrial Relations informing her that she was not eligible for unemployment

---

[49] Complaint ¶ 14. Although plaintiff noted on her log sheet that she was going to the EEOC, it wasn't until August 26, 1997, that plaintiff filled out EEOC form "Employment Discrimination Complaint Questionnaire." Plaintiff also testified that the only time she met with an EEOC representative was after her termination. Plaintiff's deposition at 200. A Charge of Discrimination pertaining to these complaints was not completed by plaintiff until December 4, 1997, well after her termination.

[50] Complaint ¶ 15; Plaintiff's evidentiary submission, volume II (doc. no. 30), at 57, 59.

16

compensation benefits because she had been discharged by her employer "for cause": the use of profanity and abusive language on the job.[51] Plaintiff appealed that decision and presented testimony and witnesses at a hearing before an appeals referee on December 2, 1997.[52] The Board did not participate in the appeals process, and did not present evidence at the hearing. The appeals referee reversed the initial decision of the claims examiner and found that the "evidence presented does not substantiate [that] the claimant committed an act of misconduct."[53] The Board did not appeal that decision.

### III. DISCUSSION

#### A.   Plaintiff's Motion for Partial Summary Judgment

Plaintiff's contention that the Board should be precluded from relitigating the stated reasons for her termination, because the state appeals referee concluded that plaintiff did not commit misconduct warranting termination,[54] can be dealt with summarily.

The United States Supreme Court has quite clearly held that judicially unreviewed state administrative proceedings do not have

---

[51] Plaintiff's memorandum in support of motion for partial summary judgment (doc. no. 18), Exhibit A.

[52] Plaintiff's memorandum in support of motion for partial summary judgment (doc. no. 18), Exhibit B.

[53] Id.

[54] Plaintiff's memorandum in support of motion for partial summary judgment (doc. no. 18).

17

preclusive effect on an employee's Title VII discrimination claims. *University of Tennessee v. Elliott*, 478 U.S. 788, 796, 106 S.Ct. 3220, 3225, 92 L.Ed 635 (1986); *see also Astoria Federal Savings and Loan Association v. Solimino*, 501 U.S. 104, 110, 111 S.Ct 2166, 2171, 115 L.Ed.2d 96 (1991) (judicially unreviewed state administrative findings do not have a preclusive effect on a plaintiff's claim under the Age Discrimination in Employment Act of 1967). *Cf. Mitchell v. Humana Hospital-Shoals*, 942 F.2d 1581 (11th Cir. 1991) (holding that a state court decision denying a former employee unemployment compensation benefits did not establish as a matter of law that the employee did not have just cause to resign her position, nor did the state court decision preclude under principles of collateral estoppel the former employee's Title VII retaliatory constructive discharge claim); *Garner v. Giarrusso*, 571 F.2d 1330 (5th Cir. 1978)[55] (holding that the unreviewed decision of a city civil service commission did not act as a bar, under either principles of res judicata or collateral estoppel, to an employee's Title VII and § 1981 race discrimination claims).

Accordingly, plaintiff's motion for partial summary judgment is due to be denied.

---

[55] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

**B.    Defendant's Motion for Summary Judgment**

    **1.    Sexually hostile work environment claim**

Title VII of the Civil Rights Act of 1964 "prohibits employment discrimination on the basis of gender, and seeks to remove arbitrary barriers to sexual equality at the workplace with respect to 'compensation, terms, conditions, or privileges of employment.'" *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1981) (citations omitted). EEOC interpretative guidelines provide that "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a) (1995).

Not all offensive conduct occurring in the workplace subjects an employer to liability under Title VII, however. Rather, "to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 370-371, 126 L.Ed.2d 295 (1993). It is only when "the workplace is permeated with

'discriminatory intimidation, ridicule, and insult,' [that] is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ... [that] Title VII is violated." *Id.* at 21, 114 S.Ct. at 370 (citations omitted).

To establish a prima facie case for hostile work environment sexual harassment, an employee must show that: (1) she belongs to a protected class; (2) she has been subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon her sex; (4) the harassment complained of was sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment; and (5) a basis for holding the employer liable. *See, e.g., Mendoza v. Borden, Inc.* 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*); *Henson,* 682 F.2d at 903-905.

As a female, plaintiff clearly is within a Title VII protected class. Addressing the second element of a prima facie case, plaintiff contends that male employees regularly used "foul language" and often told "inappropriate gender-based jokes."[56] Plaintiff does not go beyond such conclusory assertions. She has not related the details of any specific occurrence of offensive

---

[56] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 1.

verbal comments.  Plaintiff does, however, describe two instances of gender-based offensive conduct: *i.e.*, the incident where an oversized brassiere was placed on an office door at the operations building; and, the incident when female hygiene products were scattered around the custodial employees' break room.  Viewing the evidence in a light most favorable to plaintiff, she arguably has met the second element of a prima facie case.

The third element plaintiff must show is that the harassment was directed at her because of her sex.  *Henson*, 682 F.2d at 904-905.  Even if the oversized brassiere incident were directed specifically at plaintiff, it is debatable whether that conduct addressed plaintiff's sex or her size.  It has been pointed out (and plaintiff does not contest) that she is overweight,[57] and defendant accordingly contends the intent behind that act is ambiguous — that such offensive behavior more likely than not was a crude and unkind reference to plaintiff's weight.

Even if this court accepts plaintiff's equally likely contention that both incidents were motivated by a sexually discriminatory animus, she still must demonstrate that the harassment complained of was sufficiently severe or pervasive as to

---

[57] For example, plaintiff's driver's license, lists her height as 5'03 and her weight as 250 pounds.  Plaintiff's evidentiary submission, volume II (doc. no. 30), at 220-221.

alter the conditions of her employment, and create a working environment that a reasonable person would find hostile or abusive. *Harris*, 510 U.S. at 21, 114 S.Ct. at 370. Satisfying this fourth element of a prima facie case requires the court to examine the totality of the circumstances, including: "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23, 114 S.Ct. at 371. Plaintiff's claim founders on this fourth element of a prima facie case.

"Title VII is not a federal 'civility code.'" *Mendoza*, 195 F.3d at 1245 (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1000-02, 140 L.Ed.2d 201 (1998)). "'[S]imple teasing,' ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (citation omitted); *see also Meritor*, 477 U.S. at 67, 106 S.Ct. at 2399 ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII."); *DeAngelis v. El*

*Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

The allegedly offensive utterances described by plaintiff only in the most conclusory fashion, even when considered together with her descriptions of the oversized bra and feminine hygiene products incidents, are not sufficiently severe or pervasive to be actionable under Title VII. Therefore, summary judgment is due to be granted on plaintiff's hostile work environment claim.

### 2.    Failure to promote claim

To prevail on a Title VII disparate treatment claim, a plaintiff must prove that the employer intended to discriminate against her on the basis of one of the impermissible factors identified by Congress: *i.e.*, "because of such individual's race,

23

color, religion, sex, or national origin." 42 U.S.C. §
2000e-2(a)(1).

### a. direct evidence

When a plaintiff establishes by direct evidence that a
contested employment decision was motivated by a discriminatory
animus, the employer "may avoid a finding of liability only by
_proving_ by a preponderance of the evidence that it would have made
the same decision even if it had not taken the plaintiff's gender
into account." _Price Waterhouse v. Hopkins_, 490 U.S. 228, 258, 109
S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989) (emphasis supplied)[58]; _see
also, e.g., Carter v. Three Springs Residential Treatment_, 132 F.3d
635, 641 (11th Cir. 1998); _Haynes v. W.C. Caye and Company, Inc._,
52 F.3d 928, 931 & n.8 (11th Cir. 1995).

Direct evidence is evidence which, if believed, proves the
existence of a fact in issue without the need of an inference or a
presumption. _See, e.g., Carter v. Three Springs Residential
Treatment_, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by

---

[58] The Supreme Court also held with respect to such evidence that, once a
plaintiff "shows that gender played a motivating part in an employment decision,
the defendant may avoid a finding of liability only by proving that it would have
made the same decision even if it had not allowed gender to play such a role."
_Price Waterhouse_, 490 U.S. at 244-45, 109 S.Ct. at 1787-88. Justice O'Connor's
concurring opinion in _Price Waterhouse_ is to the same effect: "Once a Title VII
plaintiff has demonstrated by direct evidence that discriminatory animus played
a significant or substantial role in the employment decision, the burden shifts
to the employer to show that the decision would have been the same absent
discrimination." _Id._ at 276, 109 S.Ct. 1804 (O'Connor, J., concurring).

definition, is evidence that does not require ... an inferential leap between fact and conclusion."); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (defining direct evidence as "evidence, which if believed, proves existence of fact in issue without inference or presumption"). Eleventh Circuit precedent establishes that "direct evidence is composed of 'only the most blatant remarks, whose intent could be nothing other than to discriminate' on the basis of some impermissible factor." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

The crucial issue to be addressed at this juncture is whether Holladay's statement — that the position sought by plaintiff required an individual with a "strong hand," because it involved the supervision of men — can be construed as direct evidence of discrimination. The Eleventh Circuit has found similar, but <u>not identical</u>, comments by decision-makers or supervisors to be "classic example[s] of direct evidence." *Haynes v. W.C. Caye & Co., Inc.* 52 F.3d 928, 930-931 (11th Cir. 1995) (statement of supervisor that women were not tough enough to do a particular job, found to be direct evidence); *see also Bell v. Crackin Good Bakers,*

*Inc.*, 77 F.2d 1497, 1501 (11th Cir. 1985) (statement of supervisor that if it were up to him, there would be no women employed at plant, because men were better able to perform required functions, deemed direct evidence of discrimination).

While the preceding statements explicitly refer to the employee's sex — *i.e.*, <u>women</u> are not tough enough, or <u>women</u> are unable to adequately perform required job duties — Holladay's statement requires an inferential leap to discern a discriminatory animus. His statement that the position required a "strong hand," because it involved the supervision of men, is ambiguous and open to more than one interpretation. On one hand, the statement could be construed as meaning that plaintiff's sex precluded her becoming custodial supervisor. On the other hand, the statement also could mean that plaintiff lacked the mettle or fortitude to adequately supervise a large group of custodians, or that plaintiff's affable relationship with the other custodians was such that it would prevent her from disciplining or supervising employees in a detached or professional manner. Because Holladay's statement "at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Schoenfeld*, 168 F.3d at 1266 (citing *Burrell v. Board of Trustees of Georgia Military*

*College*, 125 F.3d 1390, 1393 (11th Cir. 1997)).  Having determined that Holladay's statement is too ambiguous to constitute direct evidence, this court now will analyze plaintiff's failure to promote claim as one based on circumstantial evidence.

### b. circumstantial evidence

When evaluating Title VII claims supported by circumstantial evidence, courts are guided by the now familiar analytical framework that the Supreme Court announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973), and then elaborated in its progeny.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If a plaintiff does so, then at the second stage of analysis the burden of production shifts to the defendant to rebut the presumption[59] of intentional discrimination thus created by articulating legitimate, nondiscriminatory reasons for the contested employment action.  *See Burdine*, 450 U.S. at 253, 101

---

[59] *See Walker v. Mortham*, 158 F.3d 1177, 1185 n.10 (11th Cir. 1998), for an excellent discussion of the reasons why presentation of a prima facie case creates "a *presumption*, and not an *inference*, of intentional discrimination." (Emphasis in original.)

27

S.Ct. at 1093.   If a defendant carries its burden, then in the final step of inquiry the plaintiff must have an opportunity to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998).   The plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct' ...." *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).   The plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d

at 1538 (quoting *Sheridan v. E.I. duPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted). The plaintiff, however, at all times maintains the ultimate burden of persuasion to prove that the defendant discriminated against her on the basis of her sex. *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749.

In order to establish a prima facie case of discriminatory failure to promote, a plaintiff must show that: (1) she is a member of a class of persons protected by Title VII; (2) she sought and was qualified for the position that was to be filled; (3) despite her qualifications, she was not selected; and (4) the position was filled by a person outside plaintiff's protected class. *See, e.g., Walker v. Mortham,* 158 F.3d 1177, 1186 (11th Cir. 1998).

Defendant concedes that plaintiff can demonstrate a prima facie case.[60]   Even so, a prima facie case merely creates "a presumption that the employer unlawfully discriminated against the employee." *Hicks*, 509 U.S. at 506, 113 S.Ct. at 2747 (emphasis added) (quoting *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094, 67 L.Ed.2d 207 (1981)).

---

[60] Defendant's brief in support of motion for summary judgment (doc. no. 29), at 13.

The Board has articulated several legitimate, non-discriminatory reasons for its decision to not promote plaintiff. First, defendant has presented evidence which, it asserts, demonstrates the superior qualifications of John Speck for the position of custodial supervisor. Defendant points to Speck's thirteen years of supervisory experience with the Board, where he worked as an electrical foreman supervising electricians.[61] There also is evidence that some members of the screening committee had concerns about plaintiff's ability to get along with other personnel.[62] Carter testified:

> Q. Based upon your familiarity with Eve and her knowledge of the job and your observations of her as a person, would you have been able to recommend Eve for the position of Custodial Services supervisor in 1997?
>
> A. Based on my working knowledge of her?
>
> Q. Yes.
>
> A. Probably not.
>
> Q. And what reasons do you base that opinion on?
>
> A. One is the ability to get along with other personnel, in this case being involved with the personnel; another reason would have to do with work ethics; another reason would be based upon an

---

[61] Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 1 (Speck deposition), at 22, 25.

[62] Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 3 (Carter deposition), at 57-58, 67-68.

observation made by me when I was at the site was the constant chatting in conversation with other personnel in the workplace during the period of time the work crews were taking place.[63]

When plaintiff's application was reviewed by the screening committee, Carter also raised issues pertaining to plaintiff's veracity. He testified:

> Q. And what input did you offer [in regard to plaintiff's application]?
>
> A. Basically, the things that we spoke about earlier as far as personnel skills, being able to deal with personnel ... and we talked about some things that we felt significant or important to the position as being truthful and trustworthy.
>
> Q. And what did you have to offer in that regard?
>
> A. In the regard it had to do with some conversation with Mrs. Jenkins early on when she was hired, when she on a regular basis would inquire about my military background, where I had been stationed, where I had served. And she would talk about some of her background such as being a Green Beret, a Navy SEAL or being airborne and knowing my wife and myself while we were stationed in Darmstadt which the fact of knowing my wife and I while in Darmstadt I knew that could not be true because I never met her in Darmstadt.... And I just felt like there was some information that may, in fact, not even be truthful.
>
> Q. Did she specifically state that she was a member of one or all those forces, Green Beret, Navy SEAL, Airborne?

---

[63] Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 3 (Carter deposition), at 57-58.

A.   Yes she did.

...

A.   She told me she was a member of — the one I didn't
     mention, she also did some work with the CIA.[64]

This evidence is sufficient to show a legitimate, non-discriminatory reason for failing to promote plaintiff to the position of custodial supervisor.

Because defendant has met its burden of production, the burden again shifts to plaintiff to show that the Board's proffered reasons are mere pretexts for discrimination.   Plaintiff argues that statements made by Assistant Superintendent Holladay are sufficient for that purpose.   Plaintiff telephoned Holladay to inquire why she had not been selected.   Holladay replied that he had not even read her resume.   He also said the position required a person with a "strong hand," because it involved supervising men.

That evidence is not sufficient to meet plaintiff's burden of showing that the Board's legitimate, nondiscriminatory reasons were mere pretexts for discrimination.   Plaintiff has failed to connect Holladay's statement (which occurred after the position had been filled), with the decision of the Board to promote Speck instead of plaintiff.   In order to properly address the lack of a nexus

---

[64] *Id.* at 67-68.

between Holladay's statement and the Board's ultimate decision to promote Speck, some background information on the Board and their role in personnel decisionmaking is appropriate.

In Alabama, county boards of education generally are composed of five members, elected by the qualified voters of the county,[65] unless a board exercises the prerogative granted by an enabling act of the state legislature "to establish single member election districts with one board member elected from each district."[66]   In that event, the board may have "five or seven such districts."[67]  The Madison County Board of Education has five members, who are elected from single-member districts and serve staggered terms.[68]  The members of the Board during the period relevant to this suit were not identified in the evidentiary submissions of either party.[69]

---

[65] Ala.Code § 16-8-1(a) (1975) (1995 Replace. Vol.) ("The county board of education shall be composed of five members, who shall be elected by the qualified voters of the county.").

[66] *Id.* § 16-8-1(b).

[67] *Id.*, providing that "[c]ounty boards of education unless otherwise provided by law may use the provisions of this subsection to establish single member election districts with one board member elected from each district. School boards exercising this option may establish five or seven such districts...."

[68] *See id.* § 16-8-2.

[69] In fact, the only reference unearthed by this court is the statement of Superintendent Broadway that "one of the five members of the Madison County Board of Education who voted to sustain my recommendation that Ms. Bott-Jenkins be discharged was a female." Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 25, at ¶ 9.

The chief executive officer of county boards of education and county school systems is the superintendent,[70] who either may be appointed by the board, or selected by direct vote of the qualified electors of the county in partisan election contests.[71]   The Superintendent of the Madison County Board of Education and school system during the dates relevant to this suit, Billy Broadway, was an elected officeholder, but his political party affiliation is not revealed in the parties' evidentiary submissions.

"The general administration and supervision of the public schools [and] of the educational interests of each county ... [is] vested in the county board of education,"[72] but actual day-to-day "control and supervision" of the school system is exercised by the superintendent.[73]

All employment, promotion, demotion, transfer, suspension, and discharge decisions are governed by statute:

> The county superintendent of education shall nominate in writing for appointment by the county board of education all principals, teachers and all other regular employees of the board.  He shall assign them to their positions, transfer them as the needs of the schools require, recommend them for promotion, suspend them for cause and recommend them for dismissal, subject to the provisions of Chapter 24 of this title.

[70] *See* Ala.Code §§ 16-8-7, 16-9-1.

[71] *See id.* §§ 16-9-2, 16-9-4 — 16-9-9.

[72] *Id.* § 16-8-8.

[73] *Id.* § 16-8-9.

*Alabama Code* § 16-9-23 (1975) (1995 Replace. Vol.).[74]

Essentially, therefore, the superintendent proposes and the board disposes: that is, the superintendent recommends persons for appointment or promotion to, or removal from, the various teaching, supervisory, or other employment positions within the school system, and the board either sustains or overrules the superintendent's written proposal by majority vote. The county board of education accordingly is the final decision making authority. Even so, in view of the statutory fact that a county board of education does not possess the authority to make any employment decision in the absence of a written recommendation by the superintendent, he also is a critical component of the final decision making process. In the apt words of Superintendent Broadway, "pursuant to the laws of this state, [he] alone possessed

---

[74] *See also id.* § 16-8-23, providing that:

> The county board of education shall appoint, upon the written recommendation of the county superintendent, all principals, teachers, clerical and professional assistants authorized by the board. The county board may suspend or dismiss for immorality, misconduct in office, insubordination, incompetency or willful neglect of duty, or whenever, in the opinion of the board, the best interests of the school require it, superintendents, principals, teachers or any other employees or appointees of the board, subject to the provisions of Chapter 24 of this title.

Chapter 24 of Title 16 of the Code of Alabama pertains to the "tenure" protections of "all persons regularly certified by the teacher certificating authority of the State of Alabama who may be employed as instructors, principals or supervisors in the public elementary and high schools of the State...." *Id.* § 16-24-1.

exclusive authority to make employment recommendations to the Madison County Board of Education. Likewise, the Madison County Board of Education was constrained from taking any employment action not recommended by [him] as superintendent."[75] For Title VII purposes, therefore, Broadway's role as an integral part of the decisionmaking process may be imputed to the Board in ascertaining a discriminatory animus for purposes of Title VII. *See Harris v. Shelby County Board of Education*, 99 F.3d 1078 (11th Cir. 1996).

The plaintiff in *Harris* was an African-American male who alleged race discrimination based on the county board's decision to hire a white as principal of one of its high schools. The Eleventh Circuit observed that, "[i]n the Title VII context, the dispute revolves around Rogers' [the county superintendent's] intent. She was the decisionmaker responsible for making employment recommendations to the Board. The record establishes that the Board can act on a matter like this only upon the superintendent's recommendation." *Id.* at 1083 n.3. *Cf. Schoenfeld v. Babbit*, 168 F.3d 1257 (11th Cir. 1999).

The *Schoenfeld* opinion addressed Title VII race and gender claims asserted by a white male plaintiff who had been rejected for

---

[75] Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 25 (Affidavit of Superintendent Billy Broadway), at ¶ 9.

a fish and wildlife biologist position by the United States Department of Interior.  The hiring procedure had several levels and involved a number of officials within the Department.[76] Speaking of the next-to-last selection official — "the assistant regional director for Human Resources for the southeast region of the United States Fish and Wildlife Service,"[77] whose approval was necessary to forward an applicant's name to the final decision making official — the court said:

> Although Boyd was not the final decision maker, he was an integral part of the multi-level hiring process that had been established by the Department of Interior's Fish and Wildlife Service.  It was necessary for him to indicate his approval or disapproval of a candidate and forward the application package before it would reach the final decision maker.  As a result, the [circumstantial] evidence regarding Boyd's conduct suggests that a discriminatory animus was at work that tainted the entire hiring process.

---

[76] *See* Schoenfeld v. Babbitt, 168 F.3d 1257, 1260-61 (11th Cir. 1999).  In summary, however,

> [t]he initial-selecting official ... sends his recommendation and the requisite forms to the assistant regional director of his program.  If that person agrees with the selection, he or she forwards it to the Office of Human Resources, where it is reviewed and screened for compliance with Equal Employment Opportunity (EEO) guidelines. After Human Resources reviews the recommended candidate package and indicates approval or disapproval, the package of materials is sent to the regional director in Atlanta, Georgia, for a final decision.  if the regional director approves the selection, then the information is sent back to personnel.  Personnel then calls the selected person and offers him or her the job.

*Id.* at 1261.

[77] *Id.* at 1262.

*Id.* at 1268.

In the instant case, there is no evidence to indicate that decisionmakers in this case, namely Superintendent Broadway or any member of the Board who approved Broadway's recommendation, either held, or were aware of, any discriminatory animus towards plaintiff. The only evidence pertaining to Superintendent Broadway's knowledge of plaintiff's claims of discriminatory treatment is a letter plaintiff wrote to him after the fact, expressing her objections to the selection process.[78] Broadway received this letter on August 7, 1997, almost two weeks after Speck was awarded the position.[79] Broadway testified that "[a]t no time did I direct, suggest or imply that a candidate's sex be considered in the selection" process.[80] Broadway further testified that he had no reason to believe that the sex of the plaintiff played any role in the deliberations of the ad hoc screening committee.

The Second Circuit case of *Barbano v. Madison County*, 922 F.2d 139 (2nd Cir. 1990), is instructive on the issue presented here. In *Barbano*, the plaintiff brought suit against a county board,

---

[78] Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 16.

[79] Plaintiff's evidentiary submission, volume II (doc. no. 30), at 146.

[80] Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 25 (Affidavit of Superintendent Billy Broadway), at ¶ 4.

alleging discriminatory failure to hire.  In order to fill the vacant position that plaintiff was seeking, the board appointed a committee to interview the potential candidates and then submit its recommendation to the board.  During the interview of the plaintiff, one member of the committee asked questions that were blatantly based on sexual stereotypes.  After the committee recommended a male, and the board approved the recommendation, plaintiff brought suit.

The Second Circuit determined that there was a basis for imputing the discriminatory actions of one committee member to the board, and based their decision on several findings.  First, the court found that other members of the committee had acquiesced, and sat silently while the plaintiff was asked a series of discriminatory interview questions.  *Id*. at 143.  The court determined that "[t]his knowing and informed toleration of discriminatory statements by those participating in the interview constitutes evidence of discrimination by all those present." *Id*. More importantly, however, the court found that the entire board was aware of the objectionable interview process.  When the board met to adopt a resolution to fill the vacant position, the plaintiff, who was present at the meeting, voiced her objections to

39

her discriminatory interview experience.  The court found that "[a]t this point, the entire Board membership was alerted to the possibility that the Committee had discriminated against Barbano during her interview."  *Id*. at 144.  Furthermore, after becoming aware of the plaintiff's allegations, the board did not investigate Barbano's objections, and simply relied upon, and approved, the committee's recommendation despite its knowledge of possible impropriety.  *Id*.

The present case is distinguishable, because there is no evidence that sex played a role during the screening committee's deliberations, or that any member of the committee knowingly tolerated any discriminatory animus that may have been held by Holladay, when the committee decided to exclude plaintiff from the list of candidates to be interviewed.  In fact, it is clear that several members of the screening committee had legitimate reservations about plaintiff being a suitable candidate for the position.  Furthermore, as stated above, plaintiff has produced no evidence that Superintendent Broadway or any member of the Board either had knowledge, or reason to be aware, of a discriminatory animus on the part of any member of the screening committee.

As such, plaintiff has not met her burden of showing that

defendant's legitimate, nondiscriminatory reasons were mere pretexts for discrimination. *See Reynolds v. Glynn County Board of Educators*, 968 F.Supp. 696, 703 (S.D. Ga. 1996) (concluding that plaintiff in a Title VII failure to promote case failed to show that defendant's nondiscriminatory reasons for non-promotion were pretextual, when the plaintiff failed to connect discriminatory statements of Board member to decision of selection committee, where selection committee was the entity that made the ultimate decision adverse to plaintiff). Therefore, the court will grant defendant's motion for summary judgment with respect to plaintiff's failure to promote claim.

### 3.    Retaliation claim

Plaintiff claims that she was terminated from her employment because she raised issues of gender discrimination within her workplace. It is well-established under Eleventh Circuit precedent that a plaintiff must prove three points in order to establish a prima facie case of retaliation: (1) that she engaged in statutorily protected expression or activity; (2) that she suffered an adverse employment action; and (3) the existence of a causal linkage between the protected conduct and the adverse action. *See, e.g., Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th

Cir. 2000); *Farley v. Nationwide Mutual Insurance Company*, 197 F.3d 1322, 1336 (11th Cir. 1999); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

An employee has engaged in activity protected by Title VII if she has either "opposed any practice made an unlawful employment practice" by Title VII, or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).

When a retaliation claim is based upon conduct falling under the opposition clause of § 2000e-3(a), the plaintiff also must demonstrate a good faith, reasonable basis for believing that the underlying, allegedly discriminatory practices constituted a violation of Title VII, as distinguished from proving that the employer actually engaged in an unlawful employment practice. *See, e.g., Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989) ("[P]laintiff need only have had a 'reasonable belief' that an unlawful employment practice was occurring."). This additional element of a prima facie case for a retaliation claim under the opposition clause has two components, as the Eleventh Circuit

observed in *Little v. United Technologies*, 103 F.3d 956 (11th Cir.

1997):

> We previously have recognized that a plaintiff can
> establish a *prima facie* case of retaliation under the
> opposition clause of Title VII if he had a good faith,
> reasonable belief that the employer was engaged in
> unlawful employment practices. *See Rollins v. State of
> Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th
> Cir. 1989).   It is critical to emphasize that a
> plaintiff's burden under this standard has both a
> subjective and an objective component.  A plaintiff must
> not only show that he <u>subjectively</u> (that is, in good
> faith) believed that his employer was engaged in unlawful
> employment practices, but also that his belief was
> <u>objectively</u> reasonable in light of the facts and records
> presented. ...

*Id*. at 960 (emphasis in original).

If plaintiff successfully establishes a prima facie case of

unlawful retaliation, the burden of production shifts to defendant,

who must articulate a legitimate, nondiscriminatory reason for the

challenged employment action.   If that burden is met, plaintiff

must produce evidence indicating that defendant's stated reason is

a mere pretext for unlawful retaliation.   The Eleventh Circuit

recently reiterated this burden-shifting framework:

> Once plaintiff establishes a prima facie case [of
> retaliation] by proving only that the protected activity
> and the negative employment action are not completely
> unrelated, the burden shifts to the defendant to proffer
> a legitimate reason for the adverse action. ... The
> burden then shifts back to the plaintiff to prove by a
> preponderance of the evidence that the "legitimate"

> reason is merely pretext for prohibited, retaliatory
> conduct.

*Sierminski v. Transouth Financial Corporation*, No. 99-4371, 2000 WL

825672, at *5 (11th Cir. June 26, 2000) (citations omitted).  *See*

*also, e.g., Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th

Cir. 1997) (noting that a plaintiff must put on enough evidence to

permit a jury to reasonably "conclude that the employer's proffered

'legitimate reasons were not what actually motivated its conduct'")

(quoting *Cooper-Houston v. Southern Railway Company*, 37 F.3d 603,

605 (11th Cir. 1994)), *cert. denied sub nom., Combs v. Meadowcraft*

*Company*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998).

Plaintiff carries the ultimate burden of showing that the defendant

intentionally retaliated against her.  *Cf. Wright v. Southland*, 187

F.3d 1287, 1292 (11th Cir. 1999) ("In sum, the plaintiff in an

employment discrimination lawsuit always has the burden of

demonstrating that, more probably than not, the employer took an

adverse employment action against him on the basis of a protected

personal characteristic.").

Plaintiff contends she was fired in retaliation for her

complaints pertaining to the discriminatory environment existing at

her workplace, and the Board's failure to award her the custodial

supervisor's position.

After Speck was promoted to the position of custodial supervisor, plaintiff confronted several of her supervisors, voicing her complaints about the allegedly discriminatory selection process.  First, plaintiff contacted, on different occasions, Roosevelt Carter and Lynn Holladay.  Furthermore, on August 7, 1997, plaintiff wrote a letter to Superintendent Broadway, questioning the propriety of the selection process for the supervisor's position, and informing him that she felt she had been discriminated against.[81]   In addition, she "noted on one of [her] 'floor crew logs' that [she] was going to the EEOC."[82] Viewing the evidence in a light most favorable to plaintiff, the court finds that she had an objectively and subjectively reasonable belief that the Board had engaged in unlawful practices when it failed to promote her.

Within approximately three months of voicing her complaints in the manner described above, an adverse employment action was taken against plaintiff.  She was discharged from her employment on October 17, 1997.

In order for plaintiff to complete her prima facie case, she

---

[81] Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 16.

[82] *Id.* at 3.   Plaintiff filled out EEOC form "Employment Discrimination Complaint Questionnaire" on August 26, 1997.  However, a Charge of Discrimination was not completed by plaintiff until December 4, 1997.

must now show a causal connection between her protected expressions and the adverse employment action.   When a plaintiff fails to present any evidence of a causal linkage between her protected activity and the alleged adverse employment action inflicted in retaliation therefor, the court must dismiss the claim.  *See Bailey v. USX Corp.*, 850 F.2d 1506, 1508 (11th Cir. 1988); *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986); *Hamm v. Members of Board of Regents of State of Florida*, 708 F.2d 647, 654 (11th Cir. 1983).

The causal link requirement is interpreted broadly by the Eleventh Circuit:   "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."   *Meeks*, 15 F.3d at 1021 (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). The causal linkage may be inferred from circumstantial evidence. *See, e.g., Goldsmith*, 996 F.2d at 1163 ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action.  ...  The defendant's awareness ... may be established by circumstantial evidence.").

The linkage has been deemed established, for example, where

46

only a short period of time elapsed between the protected expression or activity and the adverse employment action. *See Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1314-15 (7th Cir. 1989) (for purposes of establishing a *prima facie* case, the "telling" temporal sequence of events—plaintiff's complaint followed shortly by adverse employment actions—demonstrate a causal link). The Eleventh Circuit recently reiterated that the time between engagement in protected expression and the suffering of an adverse employment action must be "short" for causation to be inferred:

> Assuming, as the district court did, that the transfer to the jail was an adverse employment action, Appellant's transfer and termination occurred 15 and 21 months, respectively, after Appellant filed her grievance against her supervisor. Far from demonstrating a pattern of retaliatory activity, these two employment actions were isolated events that had no temporal relationship to Appellant's protected activity. The more than 15-month period that elapsed between Appellant's grievance and the alleged adverse employment actions belies her assertion that the former caused the latter. *See, e.g., O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1370 (7th Cir. 1993) (9-month gap between protected activity and adverse employment action precluded reasonable inference of causation); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (13-month delay between protected activity and termination too long for causation to be established); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (4-month lag between protected activity and termination not sufficient to justify an inference of causation); *cf. Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (averring that fact plaintiff

was discharged only one month after filing complaint with
EEOC "belies any assertion by the defendant that the
plaintiff failed to prove causation").

*Maniccia v. Brown*, 171 F.3d 1364, 1369-70 (11th Cir. 1999)
(footnote omitted).  The *Maniccia* court's approving citation of the
Tenth Circuit's opinion in *Conner* indicates that the expiration of
four months or more between a plaintiff's engagement in protected
expression and the suffering of an adverse employment action
nullifies any inference of causation premised solely on temporal
proximity.  In the present case, the negative employment activity
took place within, approximately, a three month period.  Based on
the above, plaintiff has established her prima facie case for
retaliation.

To rebut the presumption of intentional discrimination,
defendant offers many legitimate and nondiscriminatory reasons for
plaintiff's discharge.  The alleged use of profanity by plaintiff
is defendant's paramount justification.  Following Speck's
promotion to the custodial supervisor position, the Board states
that plaintiff confronted Roosevelt Carter, a member of the
screening committee, and addressed him as an "ass-kisser."  There
also were reports that co-workers overheard plaintiff refer to Mr.
Carter as a "nigger."  Furthermore, defendant offers evidence that

48

plaintiff referred to her new supervisor, John Speck, as a "jackass."[83] The defendant contends that plaintiff was discharged because of her repeated use of inappropriate and insubordinate language in a public school setting. Based on the production of the above evidence, the court finds that the Board has rebutted the presumption of discriminatory retaliatory discharge.

In order to show that defendant's proffered reasons are pretextual, plaintiff offers evidence showing that other employees have used vulgar or offensive language and have not been terminated. Wilkerson testified that a former Board employee, Bill Colbert, had been accused of using racially offensive language, but he was merely given a warning.[84] Furthermore, plaintiff admits that she did direct some disrespectful language towards Mr. Carter, but contends that the term used was different from that alleged by the Board.[85]  Plaintiff vehemently denies using the racial slur, "nigger," after her confrontation with Carter.  She has produced statements from witnesses which reveal that David Bailey made the

---

[83] Defendant's corrected evidentiary submission (doc. no. 27), Exhibit 22.

[84] Plaintiff's evidentiary submission, volume I (doc. no. 30), Exhibit 5 (Wilkerson deposition), at 52-55.

[85] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 2. "I informed [Carter] that I was disappointed in him and felt like he was being a 'butt kisser.' I was disappointed that he did not stick up for me.  I never used any foul or inappropriate language in addressing him." Id.

foul remark, and that she reprimanded him for doing so.[86] Finally, although plaintiff admits using the term "jackass" when talking to Speck, she contends that it was used in a completely different context than defendant's evidence reflects. Plaintiff testified:

> Q.   What was the context of [your] exchange [with Speck]?
>
> A.   ... Mr. Speck came up behind me, and he said, "Have you come to give me a letter of resignation?"   I said, "No, I haven't." He said, "Well ... [d]on't you think that ... it would be a lot better for you if you quit?" And I said, "I would have to be a jackass to quit my job."[87]

The facts pertaining to plaintiff's use of vulgar language in an insubordinate fashion thus are hotly contested, both as to whether some of the incidents occurred, as well as their exact context.   All the alleged verbal exchanges took place at the custodian's operations building and, to some extent, that fact neutralizes the Board's contention that such language is inappropriate in a "school" setting.   These factual disputes regarding the reasons for plaintiff's termination, coupled with the fact that other Board employees have used inappropriate language but have not been terminated, leads this court to conclude that a

---

[86] Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 1 (Affidavit of plaintiff), at 2; Plaintiff's evidentiary submission, volume III (doc. no. 30), Exhibit 2 (Affidavit of Kelly Bott).

[87] Plaintiff's deposition at 165.

reasonable jury could find that plaintiff has established pretext. Since there are disputed issues of material fact, the court finds that defendant's motion for summary judgment on plaintiff's retaliation claim is due to be denied.

### IV.  CONCLUSION

For the foregoing reasons, this court concludes that plaintiff's motion for partial summary judgment is due to be denied, defendant's motion for summary judgment is granted with respect to plaintiff's sexually hostile work environment claim and her failure to promote claim, but denied with respect to the retaliation claim.  An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this _22nd_ day of September, 2000.

_____

United States District Judge